RECORD NO. 10-1987(L)

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY,

*Plaintiff-Appellee,*

v.

LAKIA C. ROBERTS,

*Defendant-Appellant,*

and

ATTSGOOD REALTY COMPANY;
STEWART D. SACHS, AS TRUSTEE OF THE ASSETS OF DRECK, INCORPORATED,

*Defendants.*

### CROSS-APPEAL NO. 10-1988

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

v.

LAKIA C. ROBERTS; ATTSGOOD REALTY COMPANY;
STEWART D. SACHS, AS TRUSTEE OF THE ASSETS OF DRECK, INCORPORATED,

*Defendants-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

### OPENING BRIEF OF APPELLANT/CROSS-APPELLEE
### LAKIA C. ROBERTS

### COUNSEL LISTED ON BACK OF COVER

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

John Amato, IV*
GOODMAN, MEAGHER & ENOCH, LLP
111 N. Charles Street
Baltimore, Maryland 21201
(410) 752-3666
jamato@gmelaw.com

Bruce Harrison Powell
LAW OFFICES OF PETER T. NICHOLL
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
(410)244-7005
bpowell@nicholllaw.com

***Counsel for Defendant-Appellant/Cross-Appellee
Lakia C. Roberts***

***\* Designated as Lead Attorney***

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____ who is _____, makes the following disclosure:
  (name of party/amicus)                  (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO
2.    Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
      If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
          (signature)                                              (date)

*Pennsylvania National Mutual Casualty Insurance Company*
*v.*
*Lakia C. Roberts, et al*
BRIEF OF THE APPELLANT
<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2
ISSUES PRESENTED FOR REVIEW ...............................................................2
STATEMENT OF THE CASE...........................................................................3
STATMENT OF FACTS ..................................................................................4
SUMMARY OF THE ARGUMENT ..................................................................10

ARGUMENT ................................................................................................12

I.     APPORTIONMENT HAS NO APPLICATION IN THIS CASE. THE DISTRICT COURT ERRONEOUSLY APPLIED AN APPORTIONMENT FORMULA TO CREDIT PENN NATIONAL WITH 22 MONTHS' TIME [11/93-8/95] THAT GONDREZICK OWNED THE SUBJECT PREMISES, THEREBY REDUCING PENN NATIONAL'S INDEMNITY LIABILITY FOR ROBERTS' JUDGMENT AGAINST ATTSGOOD FROM $850,000 TO $370,600 ...........................................12

     A.     Standard of Review on Appeal from Summary Judgment ................12

     B.     The Development of Apportionment Methodology . ........................13

     C.     This Court Applies Pro-Rata Allocation in *Spartan*, But *Spartan* Does Not Allocate Insurer Liability Across Multiple Joint Tortfeasors ...............................................................17

     D.     Penn National's Reliance Upon *Utica Mutual, Riley* and *Hanson* Is Misguided; Those Cases Do Not Involve Multiple Defendant/Insureds ..........................................................21

i

E.    The Policy Language Supports Roberts' Position That Allocation is Not Spread Over the Period of Gondrezick's Ownership ................................................. 25

II.    THE DISTRICT COURT ERRONEOUSLY APPLIED AN APPORTIONMENT FORMULA TO CREDIT PENN NATIONAL WITH 12 MONTHS' TIME [1/91-1/92] THAT ATTSGOOD WAS UNINSURED, EVEN THOUGH PENN NATIONAL OFFERED NO EVIDENCE BELOW THAT INSURANCE WAS AVAILABLE, THEREBY REDUCING PENN NATIONAL'S INDEMNITY LIABILITY FOR ROBERTS' JUDGMENT AGAINST ATTSGOOD FROM $850,000 TO $370,600.......................................................... 27

A.    The Burden Properly Fell Upon the Moving Party, Penn National, and the Insured, Attsgood, to Establish the Availability of Insurance......................................... 29

B.    The Policy Contains Its Own Allocation Formula That is Based on Policy Limits, Not Time-On-The-Risk ................ 31

III.    ASSUMING ARGUENDO THAT PRORATION FOR THE PERIOD OF NO INSURANCE IS APPROPRIATE HERE, THE DISTRICT COURT ERRONEOUSLY USED ROBERTS' DATE OF BIRTH, RATHER THAN HER FIRST ACTUAL LEAD EXPOSURE, TO CREDIT PENN NATIONAL WITH 20 MONTHS' TIME THAT UNJUSTLY REDUCED PENN NATIONAL'S INDEMNITY LIABILITY TO ATTSGOOD FROM $850,000 TO $370,600 ...................................... 32

CONCLUSION ....................................................................... 38

REQUEST FOR ORAL ARGUMENT ........................................... 38

STATEMENT OF FONT SIZE AND LOCAL RULE 32(a)(7) CERTIFICATION ..................................................................... 39

CERTIFICATE OF SERVICE ....................................................... 40

*Pennsylvania National Mutual Casualty Insurance Company*
*v.*
*Lakia C. Roberts, et al*
BRIEF FOR APPELLANT
<u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*,
45 Cal. App. 4th 1, 52 Cal. Rptr. 2d 690 (1st Dist. 1996) . . . . . . . . . . . . . . . . 14, 16

*Boston Gas. Co. v. Century Indem. Co.,* 910 N.E.2d 290, 309
(Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal.
App. 3d 598, 222 Cal. Rptr. 276 (1st Dist. 1986). . . . . . . . . . . . . . . . . . . . . . . .16

*Carroll v. Kerrigan*, 173 Md. 627, 197 A.127 (1938)  . . . . . . . . . . . . . . . . . . . . .24

*Cole v. Celotex Corp.*, 588 So.2d 376 (La. Ct. App. 3d Cir. 1991),
*aff'd*, 599 So.2d 1058 (La. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543
(11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Continental Cas. Co. v. Aetna Cas. and Sur. Co.*, 823 F.2d 708
(2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Continental Cas. Co. v. Medical Protective Co.*, 859 S.W.2d 789
(Mo. Ct. App. E.D. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Cooper v. Bikle*, 334 Md. 608 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals
Corp.*, 1 F.3d 365 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Herbert v. State*, 136 Md. App. 458, 766 A.2d 190 (2001). . . . . . . . . . . . . . . . . . .30

*Insurance Co. of North America v. Forty-Eight Insulations, Inc.*,
  633 F.2d 1212 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir. 1981). . . . . . . . . .16

*Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034
  (D.C. Cer. 1981), *cert denied*, 455 U.S. 1007 (1982) . . . . . . . . . . . . . . . . . .14, 22

*Lakia Roberts v. Attsgood Realty, et al*, Case No. 24-C-05-1438
  (Cir. Ct. Baltimore City) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Maryland Casualty Co. v. Hanson*, 169 Md. App. 484, 902
  A.2d 152 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 23

Mayor & City Council of Baltimore v. Utica Mut. Ins. Co., 145 Md.
  App. 256, 802 A.2d 1070 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 12, 24, 27

*Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 686,
  913 P.2d 878, 901, 42 Cal. Rptr. 2d 324 (1995). . . . . . . . . . . . . . . . . . . . . . . . . .14

*Northern States Power Co. v. Fidelity and Cas. Co. of New York,*
  521 N.W.2d 28 (Minn. 1994), *amended*, 523 N.W.2d 657
  (Sept. 30, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Owens-Illinois, Inc. v. United Ins. Co.*, 138 NJ 437, 650 A.2d 974
  (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Pacific Indem. v. Whaley*, 560 F.Supp. 2d 425 (D. Md. 2008). . . . . . . . . . . . . . .20

*Ramos v. W. Md. Elec. Coop.,* 996 F.2d 52, 53 (4th Cir. 1993). . . . . . . . . . . . . . 13

*Riley v. United Servs. Auto. Assoc.,* 161 Md. App. 573, 871 A.2d 599
  (2005), *aff'd on different grounds*, 899 A.2d 819 (Md. 2006) . . . . . . . . 21, 23, 24

*St. Paul Mercury Ins. Co. v. Northern Power Co.,* No. A07–1775,
  2009 WL 2596074 (Minn. Ct. App. Aug. 25, 2009). . . . . . . . . . . . . . . . . . .27, 29

*Scottsdale Ins. Co. v. American Empire*, 811 F.Supp. 210 (Md. 1993) . . . . . . . . . 34

*Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawaii, Ltd.*, 76 Hawaii 277, 875 P.2d 894 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Spartan Petroleum Co. v. Federated Mutual Ins. Co.*, 162 F.3d 805 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 27, 28

*Thimatariga v. Chambers*, 46 Md. App. 260, 266, 416 A.2d 1326, 1330 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

*In re Wallace & Gale Co.,* 385 F.3d 820 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . .23

*Woodale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283 (Minn. 2006). . . . . . .30

## Court Rules

Federal Rule of Appellate Procedure 6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Statutes

Maryland Code, Environment, Sec., 6-801-6-852. . . . . . . . . . . . . . . . . . . . . . . . .29
Maryland Code, Article 48A, Secs. 734-737. . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
Maryland Code, Real Property, Sec. 8-208.2 . . . . . . . . . . . . . . . . . . . . . . . . . . .29

## INTRODUCTION

This appeal and cross-appeal are taken from the grant of summary judgment below on 7/27/10, in favor of Pennsylvania National Mutual Casualty Insurance Co. ("Penn National"). Penn National was the insurer for the first of two jointly and severally liable defendants in the underlying lead paint action brought in state court on behalf of the infant plaintiff, Lakia C. Roberts ("Roberts") in 2005. Those defendants, Attsgood Realty ("Attsgood") and Gordon Gondrezick ("Gondrezick") owned the subject rental property, for purposes of exposure here, from 1991-93 and 1993-95, respectively. Roberts obtained an $850,000 judgment against Attsgood in the underlying claim. Attsgood filed a third-party claim for contribution in that action against Gondrezick. In the instant declaratory action, Penn National sought an apportionment of its indemnity liability to Attsgood, and argued alternatively that it should pay only 27%, or 40%, of Roberts' $850,000 judgment. Penn National claimed that it insured Attsgood for only 22 months, and that Roberts' single, indivisible injury spanned a total exposure period, in Penn National's view, of either 84 months or, at a minimum, 56 months; hence, Penn National's liability was to be calculated at 27% (22÷84) or 40% (22÷56). Apportionment is an equitable remedy originally devised to fairly allocate liability among multiple carriers which insure, at various times, a single indivisible risk spanning several years or policy periods. However, since there was only a single insured risk here, i.e., Attsgood's liability to

Roberts, apportionment had no application in this case whatsoever. The district court erroneously apportioned Penn National's liability here in two crucial respects: (1) it credited Penn National with 22 months' time that *Gondrezick* owned the property, even though that exposure, if any, was not part of the risk (i.e., the Attsgood liability) for which Penn National insured Attsgood; and (2) it credited Penn National with 12 months' time in which Attsgood was uninsured, even though the record is completely devoid of *any* evidence as to why Attsgood was uninsured during that time. Without such evidence, that uninsured credit is directly contrary to controlling Maryland law. The district court then calculated Penn National's apportioned liability to be only $370,600 of Roberts' $850,000 judgment.

## JURISDICTIONAL STATEMENT

This case began when Penn National initiated a declaratory judgment action under 28 U.S.C. §1332 on 10/9/09 to limit its liability to indemnify Attsgood for the $850,000 judgment entered against Attsgood in the underlying state court action. Penn National moved for summary judgment on 6/3/10. Roberts cross-moved for summary judgment on 7/1/10. Roberts appeals from the district court's 7/27/10 final Orders on the cross-motions for summary judgment, setting Penn National's apportioned liability at $370,600 and disposing of all parties' claims. Roberts' notice of appeal was timely filed on 8/26/10. This Court has jurisdiction under 28 U.S.C. §1291 and Federal Rule

of Appellate Procedure 6(a).

## ISSUES PRESENTED FOR REVIEW

(1) Whether the district court erroneously applied apportionment methodology to credit Penn National with 22 months' time [i.e. from 11/93-8/95] that Gondrezick owned the subject property, thus reducing Penn National's indemnity liability to Attsgood from $850,000 to $370,600;

(2) Whether the district court erroneously applied apportionment methodology to credit Penn National with 12 months' time that Attsgood was uninsured [i.e. from 1/91-1/92], even though the record is devoid of any evidence as to why Attsgood was uninsured during that time, thus reducing Penn National's indemnity liability to Attsgood from $850,000 to $370,600; and

(3) Whether the district court erroneously used Roberts' date of birth, rather than date of her first actual lead injury, to credit Penn National with 20 months' time that unfairly reduced Penn National's indemnity liability to Attsgood from $850,000 to $370,600.

## STATEMENT OF THE CASE

Penn National filed this declaratory action on 10/9/09 (J.A. 11-48). Roberts answered on 12/8/09 (J.A. 49-54). Penn National moved for entry of default against its insured, Attsgood, on 12/30/09 (J.A. 55-57). An order of default was entered

3

against Attsgood on 1/12/10 (J.A. 58).  Penn National moved for summary judgment

against Roberts on 6/3/10 (J.A. 72-214).  At the same time, Penn National moved for

default judgment against Attsgood.  Roberts opposed the summary judgment motion

on 6/17/10, and at the same time cross-moved for summary judgment against Penn

National (J.A. 215-334).  Penn National opposed Roberts' cross-motion on 7/1/10

(J.A. 335-66), to which Roberts filed a reply on 7/15/10 (J.A. 367-83).  The district

court filed a letter opinion on 7/27/10, granting Penn National's motion for summary

judgment "to the extent that Penn National seeks to limit its liability to Roberts to

$370,600" (J.A. 384-87).  The court also entered default judgment for Penn National

against Attsgood (J.A. 385-87).  The court's 7/27/10 Order disposed of all claims

below.  Roberts timely filed her notice of appeal on 8/26/10 ( J.A. 389-90).  Penn

National filed its notice of cross-appeal (because the court did not further reduce its

liability to Roberts below $370,600) on 8/26/10 (J.A. 391-92).   This Court

consolidated the two appeals on 8/31/10 (J.A. 393-94).

## STATEMENT OF FACTS

The instant case stems from an $850,000 judgment obtained by Lakia Roberts

in the Circuit Court for Baltimore City captioned *Lakia Roberts v. Attsgood Realty,

et al*, Case No. 24-C-05-1438 (hereinafter, the "underlying case") (J.A. 395-414).  In

the underlying case, Roberts sued Attsgood and Stewart D. Sachs, as trustee of the

4

assets of Dreck, Inc. ("Sachs"),[1] for injuries she sustained from lead paint poisoning at the Attsgood rental property (J.A. 19-33). Roberts filed suit on 2/4/05. Attsgood and Sachs then filed a third-party complaint for contribution against the subsequent owner of the subject property, Gordon Gondrezick, on 12/21/07.[2] After Gondrezick failed to appear, the state court entered an order of default against him on 3/26/09, in favor of Attsgood and Sachs (J.A. 410).

After a 5-day jury trial, a verdict was returned in favor of Roberts in the amount of $2,000,000 on 5/8/09 (J.A. 411). In post-trial motions, the verdict was reduced to $850,000 upon application of the Maryland non-economic damages cap. At the request of Attsgood and Sachs, a default judgment was entered against Gondrezick (J.A. 251). The trial judge entered final judgment in favor of Roberts in the amount of $850,000 *"equally"* against Attsgood, Sachs and Gondrezick on 7/31/09 (J.A. 251,

---

[1]For all relevant purposes here, Attsgood and Sachs constitute one defendant/insured. Dreck, Inc. was a general partner in Attsgood Realty. Sachs was the trustee of Dreck's assets after Dreck forfeited its corporate charter. Sachs was listed as an additional named insured under the Attsgood policy with Penn National. Therefore, where appropriate, Attsgood and Sachs will hereinafter be collectively designated as "Attsgood."

[2]Roberts decided not to add a direct claim against Gondrezick because her lead levels were in fact declining during his period of ownership (J.A. 275).

5

414).[3]

Penn National, the insurer of Attsgood/Sachs during the relevant period in the underlying case, subsequently filed the instant declaratory action, incorrectly alleging that it was only obligated to pay a small percentage of the joint and several judgment under a misguided theory of "time on the risk" apportionment.  In its motion for summary judgment below, Penn National asked: "what percentage of the judgment previously rendered in favor of Roberts must Penn National pay under the insurance contract that it issued to Attsgood Realty?"  (J.A. 202).  The only correct answer to that question, under Maryland law, is: the entire $850,000 judgment, which was entered jointly and severally against Attsgood and Gondrezick.

### *The Undisputed Facts of Roberts' Lead Exposure*

Penn National issued a policy of insurance to Attsgood for 1740 E. Preston Street, Baltimore, Maryland ("subject premises") for the period of January 13, 1992 to January 13, 1993 (J.A. 116-57).  The policy was thereafter renewed to January 13, 1994 (J.A. 158-63).  By endorsement dated 1/25/93, the policy was amended to include Sachs as an additional named insured (J.A. 186).  The subject premises were

---

[3]Technically, the judgment in the underlying case was erroneous since Roberts never sued Gondrezick.  Judgment should have been entered in favor of Roberts against Attsgood and Sachs and in favor of Attsgood and Sachs against Gondrezick.  However, that error does not affect the allocation analysis at issue here, because Penn National concedes that the liability of Attsgood and Gondrezick is joint and several (J.A. 340).

6

then sold to Gondrezick on 11/1/93 (J.A. 204).

Lakia Roberts was born on January 17, 1991 (J.A. 264). It is undisputed that she resided at 1740 E. Preston Street, the subject premises, from her birth until sometime in 1998. She was initially diagnosed with an elevated lead level at 20 months of age (J.A. 264). That initial blood lead level was 28 mcg/dL[4] in September 1992 (J.A .269). She was subsequently tested to have lead levels of:

- 15 mcg/dL in December 1992 (J.A. 269);
- 12 mcg/dL on March 11, 1993 (J.A. 271);
- 16 mcg/dL on June 3, 1993 (J.A. 274);
- 19.1 mcg/dL on September 2, 1993 (J.A. 274);
- 14.8 mcg/dL in November 1993 (J.A. 275);
- 9.5 mcg/dL in February 1994 (J.A. 275), and
- 12 mcg/dL in August 1995  (J.A. 275).

At the trial of the underlying case, Roberts' medical expert, Jacalyn Blackwell-White, M.D., testified that children are determined to have been injuriously exposed to lead  by looking at serum lead levels (J.A. 265). Lead gets into the child though

---

[4]Mcg/dL is an abbreviation for micrograms per deciliter. Lead exposure adversely affects the cognitive development and behavior of young children. For children aged ≤6 years, the Center for Disease Control (CDC) has defined an elevated blood lead level (BLL) as ≥10 mcg/dL. Data from CDC's Third National Health and Nutrition Examination Survey, Phase 2 (1991-1994) (NHANES) showed that average BLLs in children had decreased approximately 80% since the late 1970s but that elevated BLLs remained more common among low-income children, urban children, and those living in older housing. As noted above, Roberts' elevated BLL had begun to decline after transfer of the subject premises to Gondrezick on 11/1/93.

ingestion via the mouth, then goes into the gastrointestinal ("GI") tract where it is quickly absorbed into the child's systems (J.A. 256).  According to Dr. Blackwell-White, children access the leaded paint by, "pull[ing] up and gnaw[ing] on whatever is around them, and crawl[ing] on the floor and put[ing] their hands in their mouths." (J.A. 313-14).

Dr. Blackwell-White testified that, after her initial diagnosis of elevated lead levels in September 1992, Roberts experienced an "increase in lead levels to about 31 months, just under the age of three, and then a gradual decrease" (J.A. 278).  Dr. Blackwell-White then unequivocally testified that Roberts' lead levels indicate that she was exposed to lead from the age of 20 months to the age of four years:

> Q.  Was the duration of Lakia Roberts' lead exposure significant to you in this case?
>
> A.    Her lead levels themselves indicate that she was exposed, conservatively,  *exposed to lead from the age of 20 months on through to four years.*  And in fact, beyond that.  But the levels themselves, based on the CDC points of ten and above, would take her at least down to four years (J.A. 279).

### *The Calculus of Apportionment of Liability for the Underlying Judgment*

Penn National argued below that Roberts' total exposure was from her birth in 1991 until her family moved out of the property in 1998, a total of 84 months (J.A. 211).  Alternatively, Penn National asserted that even if Roberts' exposure ended with

8

her last elevated lead level in 1995, her total exposure was 55 months (J.A. 212).[5]

Next, Penn National claimed that, while it insured Attsgood for 24 months from 1/92-

1/94, since Attsgood transferred the property to Gondrezick in 11/93, two months

before the policy ended, Penn National's pro-rata share of the exposure was only 22

months (J.A. 210). Therefore, says Penn National, its liability is calculated at either

27% (22÷84) of the $850,000 judgment ($222,619) or at most 40% (22÷56) of the

$850,000 judgment ($333,929) (J.A. 211-12).

Roberts, on the other hand, objected to including within the above calculation

any period after the property was sold to Gondrezick, since allocation is never

calculated across the joint tortfeasor's separate risk (J.A. 227-29, 376-78). Moreover,

Roberts also objected to including any period of time that Attsgood was uninsured,

because Penn National had introduced no evidence below that insurance was available

to Attsgood during that period (J.A. 226-27). Finally, Roberts also objected to

including the time that Attsgood was uninsured because there was no evidence that

Roberts was injuriously exposed for the first 20 months of her life (J.A. 229-33, 368-

76). Roberts contended that Penn National was liable for the entire $850,000

---

[5]Penn National purported to alternatively restrict Roberts' exposure to "her periods of elevated blood-lead" (J.A. 212), but never actually agreed to accordingly limit the allocated exposure period from 9/92-8/95, the inclusive period of elevated BLLs. Rather, despite its claim to voluntarily restrict the exposure period to the period of elevated blood lead, Penn National *always* calculated the period as beginning with her birth in 1991.

judgment.

The district court gave Penn National almost everything it wanted. The court allocated Penn National's liability over Gondrezick's ownership, not just Attsgood's (J.A. 384-85). The court also started the exposure period with Roberts' date of birth, erroneously citing Dr. Blackwell-White's testimony and the closing argument of Roberts' counsel in the underlying trial (J.A. 384). The court also incorrectly assigned the burden of proof on the unavailability of insurance issue to Roberts, not Attsgood or Penn National (J.A. 384 note 1). The only portion of the ruling in Roberts' favor was that the court declined to shorten Penn National' coverage from 24 to 22 months, because the record was devoid of any evidence that its coverage was terminated after the transfer to Gondrezick (J.A. 385 note 2). Both Roberts and Penn National appealed.

## SUMMARY OF THE ARGUMENT

Apportionment has no place in this case under any circumstances. Attsgood's liability to Roberts is joint and several for the entire underlying judgment–$850,000. No other insurer was on the risk for Attsgood; therefore, apportionment has no applicability. Even if it were to be applied across joint tortfeasors in this case as a matter of first impression, the apportionment formula was incorrectly applied.

The risk which Penn National insured was Attsgood's liability to Roberts, not

Roberts' underlying injury.  It was, therefore, simply wrong to allocate Penn National's indemnity liability to Attsgood across the subsequent exposure period that Gondrezick owned the subject premises.  Even if apportionment were applicable here at all, the appropriate period of allocation time was the period of injurious exposure during Attsgood's ownership.  None of the allocation cases cited by Penn National below dealt with more than a single defendant/insured.  Penn National's formula, applied by the court below, not only fails to advance the policy goals behind apportionment, but puts a plaintiff like Roberts into the untenable position of having to choose between pursuing the subsequent tortfeasor (Gondrezick) and running the risk that, in so doing, she will minimize or nullify the available insurance carried by the earlier tortfeasor (Attsgood).  The policy language itself supports Roberts' argument.

Further, although Maryland follows the rule that apportionment is appropriate (within the Attsgood exposure) for periods of no insurance or self-insurance, that credit only comes into play if there is evidence that insurance was indeed available during that period.  No such showing was made by Penn National here.  It was, therefore, erroneous to allocate Penn National's indemnity liability to Attsgood across the 12-month period that Attsgood was uninsured.  Attsgood and Penn National, not Roberts, bear the burden of proof on that issue and did not meet that burden here.

Finally, even if it were appropriate to allocate Penn National's liability across any period of time that Attsgood was uninsured, there was no evidence of lead paint exposure to Roberts during such period.   Roberts' injurious exposure did not potentially begin until she was capable as a toddler of hand-to-mouth ingestion of lead paint particles at age 12-36 months.  The uncontradicted evidence of her expert was that the injurious exposure began at the age of 20 months, after Penn National was on the risk.

## ARGUMENT

**I.    APPORTIONMENT HAS NO APPLICATION IN THIS CASE.   THE DISTRICT COURT ERRONEOUSLY APPLIED AN APPORTIONMENT FORMULA TO CREDIT PENN NATIONAL WITH 22 MONTHS' TIME [11/93-8/95] THAT GONDREZICK OWNED THE SUBJECT PREMISES, THEREBY REDUCING PENN NATIONAL'S INDEMNITY LIABILITY FOR ROBERTS' JUDGMENT AGAINST ATTSGOOD FROM $850,000 TO $370,600.**

### A.   Standard of Review on Appeal from Summary Judgment.

Roberts agrees with Penn National that this case was appropriate for disposition via summary judgment.  Roberts simply contends that the district court erroneously applied the law to the undisputed facts of this case, both as to: (1) the calculation of Penn National's allocation; and (2) the use of Roberts' date of birth as the onset of her injurious lead exposure, rather than her first elevated BLL in September 1992.

In reviewing a district court's grant of summary judgment, this Court applies the same standards as those employed by the district court. *Ramos v. W. Md. Elec. Coop.,* 996 F.2d 52, 53 (4th Cir. 1993). The scope of review is *de novo. Id.* Summary judgment is appropriate in those cases in which there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56; *Ramos,* 996 F.2d at 53.

## B. The Development of Apportionment Methodology.

The method of allocating damages for claims for latent bodily injury and property damage, sometimes called long-tail or continuous injury or damage, is a critical and determinative question of law that may substantially impact the amount of an insurance company's liability under a commercial general liability (CGL) policy. The two most common types of claims presenting this allocation question are asbestos bodily injury and environmental property damage. Lead paint injury claims, like the case at bar, also present the issue.

When tort claims against a policyholder involve damage spanning several years, the damage claim may also span several different liability insurers. In such cases, policyholders argue that any policy "triggered" by the presence of liability-creating injury during the policy period should be responsible for providing defense and indemnity for the claim, so long as the insurers who are collectively responsible for coverage are not required to pay more to the policyholder than the amount of liability

13

loss.

Where the policy limits of the triggered policies exceed the amount of liability, policyholders argue that insurers may seek contribution from one another but should not be permitted to reduce their own coverage responsibility because of the presence of other triggered insurers. *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cer. 1981), *cert denied*, 455 U.S. 1007 (1982). Policyholders also argue that insurers should not be allowed to reduce their own liability responsibility because of periods where the policyholder was uninsured. *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 686, 913 P.2d 878, 901, 42 Cal. Rptr. 2d 324 (1995); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,* 45 Cal. App. 4th 1, 52 Cal. Rptr. 2d 690, 705 (Cal. Ct. App. 1996). In such a joint-and-several *Keene* (sometimes called an "all sums") jurisdiction, any one policy year is answerable up to its full policy limits for all losses resulting from all years in which bodily injury or property damage has occurred. Under this approach, it does not matter how many years the policyholder chose to "go bare" nor how few years the insurer assumed risk.

Insurers conversely argue that where multiple policy periods are involved, courts should prorate the coverage responsibility of the insurers, with the most popular allocation method being proration according to the time period each insurer was on the risk. Where there are periods of self-insurance or no insurance, insurers seek to have

14

policyholders pay a prorated share of the costs of liability coverage.  Several courts have adopted this view.  *See, e.g., Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir. 1995) (applying New York law) (but refusing to allocate responsibility to policyholder during years when insurance was unavailable due to asbestos claims exclusion made nonnegotiable in standard liability policies); *Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997); *Northern States Power Co. v. Fidelity and Casualty Co. of N.Y.,* 523 N.W.2d 657 (Minn. 1994).  *See also Owens-Illinois, Inc. v. United Ins. Co.*, 138 NJ 437, 650 A.2d 974 (1994) (endorsing allocation and policyholder bearing of costs for uninsured periods and suggesting temporal proration as default formula but refusing to adopt *per se* formula if it is possible to determine percentage of injury that took place during different coverage periods).[6]

---

[6]Advocates of pro rata allocation argue that proration of damages is required by the policy language limiting coverage to property damage occurring *during* the policy period.  Pro rata allocation honors this plain limitation of coverage by *approximating* the "quantum of bodily injury or property damage" occurring during the policy period when the facts do not permit a more precise determination of the *actual* "quantum of bodily injury or property damage" occurring during each policy period.  It is also consistent with the widely followed maxim that an insurance policy must be read as a whole without placing undue emphasis on one provision (all sums) over another (during the policy period limitation).  This interpretation is further supported by the reasonable expectations of the parties as many courts have observed that "[n]o reasonable policyholder could have expected that a single one-year policy would cover all losses caused by [bodily injury] or toxic industrial wastes released into the environment over the course of several decades.  *Boston Gas. Co. v. Century Indem. Co.,* 910 N.E.2d 290, 309 (Mass. 2009).

15

Those courts which reject joint and several allocation are also not uniform in their apportionment approach. Some hold that distribution is to be pro rata based upon policy limits.[7] Others base pro rata distribution on the number of years the insurer was on the risk.[8]

An illustrative example demonstrates the difference between the two approaches. Assume that a lead paint defendant owns the rental property for 10 years of exposure, and that Insurer A is on the coverage for years 1 through 7, Insurer B for years 8 and

_____

Public policy considerations can also dictate proration. Among other things, "the pro rata method promotes judicial efficiency, engenders stability in the insurance market, provides incentive for responsible commercial behavior, and produces an equitable result." *Id.* at 311. Conversely, proponents of the "all sums" method argue that the insurer's promise to pay "all sums" trumps the policy language limiting coverage to the bodily injury or property damage that occurs during the policy period. In addition, "all sums" proponents argue that the "other insurance" and number of occurrence clauses contemplate coverage for occurrences that continue both before and after the policy period.

[7]*Continental Cas. Co. v. Aetna Cas. and Sur. Co.*, 823 F.2d 708 (2d Cir. 1987); *CNA Casualty of California v. Seaboard Surety Co.,* 176 Cal. App. 3d 598, 222 Cal. Rptr. 276 (1st Dist. 1986); *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal. App. 4th 1, 52 Cal. Rptr. 2d 690 (1st Dist. 1996).

[8]*Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir. 1981); *Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir. 1985); *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365 (5th Cir. 1993); *Cole v. Celotex Corp.*, 588 So.2d 376 (La. Ct. App. 3d Cir. 1991), *aff'd*, 599 So.2d 1058 (La. 1992); *Northern States Power Co. v. Fidelity and Cas. Co. of New York,* 521 N.W.2d 28 (Minn. 1994), *amended*, 523 N.W.2d 657 (Sept. 30, 1994); *Continental Cas. Co. v. Medical Protective Co.*, 859 S.W.2d 789 (Mo. Ct. App. E.D. 1993).

9, and Insurer C for year 10. In a joint and severally liable-insurer jurisdiction, Insurer C would be jointly and severally liable with A and B for the entire exposure, even though Insurer C was actually on the risk for only 10% of the exposure. Of course, once it paid the claim, Insurer C could then sue A and B for contribution but, depending upon which jurisdiction is involved, might still be liable for a of the total payment, or some other amount greater than 10%, according to relative policy limits. Under the time-on-the-risk apportionment approach, however, Insurer C is liable for only 10% of the underlying judgment. What C cannot do, and what equitable apportionment was never intended to address, is to go beyond its own insured and its own underwritten risk. Thus, if after year 10 the plaintiff also had lead exposure at the hands of another defendant, C cannot tack on that additional exposure and pro-rate its so-called time on the risk accordingly. That, however, is precisely what the district court did below for Penn National. Insurer C's risk is properly defined as the liability *to its own insured*, not exposure for which a separate defendant (not its insured) is liable.

### C. This Court Applies Pro-Rata Allocation in <u>Spartan</u>, But <u>Spartan</u> Does Not Allocate Insurer Liability Across Multiple Joint Tortfeasors.

This Court, applying South Carolina law, adopted the "time-on-the-risk" apportionment analysis in *Spartan Petroleum Co. v. Federated Mutual Ins. Co.*, 162

F.3d 805 (4th Cir. 1998).  In that case, Federated Mutual insured Spartan between 1/19/85-1/18/87.  In January 1986, Spartan discovered that its underground gasoline storage system was leaking.  That leak spread ultimately to an adjoining property, whose owners (Roshto) sued Spartan.  This Court applied time-on-the-risk analysis and remanded the case with instruction to allocate a pro-rata share of liability to Federated equal to the period its policies covered, divided by the total period of Spartan's liability for damages.  That period of damages was then defined as running from the time the contamination of the neighbor's property occurred until the time it was discovered in 1990.  Spartan was self-insured after 1/19/87.  Therefore, if the contamination started on 1/19/85 and was discovered on 1/19/90, for example, the damage period would be 60 months, of which Federated was on the risk for 24 months.  Federated's resulting liability would be for 40% of the neighbor's damages. While Spartan had to bear its own liability for the period in which it was self-insured, the insured risk was nevertheless properly identified as Spartan's liability to the neighbor, Roshto.  Nowhere does the *Spartan* court even remotely suggest that had Spartan sold out during the period of contamination, and had the subsequent owner insured its own risk, that Federated would be allowed to pro-rate its liability over the entire subsequent exposure period, as the district court allowed Penn National to do here.  In short, the contingency that Penn National insured against was *the risk of*

18

*liability to Attsgood* for injury that occurred at the subject property, not the total injury itself. The court in *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawaii, Ltd.*, 76 Hawaii 277, 875 P.2d 894 (1994), upon which the *Spartan* court expressly relied, stated the principle clearly:

> In the third-party insurance context, however, the contingency insured against is the risk of liability to another for personal or property injury...Here, the contingency insured against under the First Insurance and Sentinel policies concerned the Honofed entities' liability for the damage that occurred at the apartment complex, not the damage itself.

875 P.2d at 920-21. In the instant case, Roberts is not the insured; Attsgood is. The risk that Penn National insured against was that Attsgood would become liable to Roberts, not Roberts' total exposure. There was simply no reason to calculate Penn National's liability through the period of Gondrezick's subsequent exposure time.

The stated public policy goals behind "time on the risk" apportionment methodology are: (1) maximization of insurance resources available to compensate the underlying tort victim; (2) creating incentives for the purchase of insurance; and (3) notions of simple justice. *See Owens-Illinois, supra*, 650 A.2d at 990-92. None of these goals are advanced by the district court's unique application of apportionment here. Roberts has been denied access to the full insurance coverage available to Attsgood through Penn National. Attsgood, the tortfeasor, certainly has less incentive to purchase insurance if the coverage it thought would indemnify Attsgood for its joint

19

and several liability for the full $850,000 judgment can be reduced by 57% simply because Roberts' exposure extended beyond the risk for which Attsgood bought the policy.[9]  Gondrezick, the joint tortfeasor, likewise has less incentive to purchase insurance if Penn National pays only 43% of the judgment and thus Attsgood's contribution claim against Gondrezick is extinguished accordingly.[10]  Finally, the district court's decision effectively destroys the concept of joint and several liability, as it denies Attsgood the ability to insure itself against the full judgment, thus leaving the plaintiff with an uncollectible balance *only* because her exposure extended beyond Attsgood's ownership.

Moreover, Penn National's absurd apportion formula, if adopted, confronts any future plaintiff like Roberts with a Hobson's Choice–does she sue a subsequent tortfeasor (like Gondrezick here) and thus try to maximize the number of defendants against whom she can potentially recover, or does she forego the claim against the subsequent tortfeasor, in order to protect her claim against the earlier funded

---

[9]If this were an asbestos case, for example, where an individual's toxic exposure may span 40-50 years, the first tortfeasor (Attsgood here) would have little incentive to buy insurance if it knew its liability coverage could be effectively diluted to near zero if its carrier could tack on 40 subsequent years of exposure to other tortfeasors' products.

[10]Under Maryland law, Attsgood's contribution claim against Gondrezick does not exist until Attsgood has paid, under legal compulsion, more than its pro-rata share of the joint and several obligation.  *Pacific Indem. v. Whaley*, 560 F.Supp. 2d 425 (D. Md. 2008).

tortfeasor, (like Attsgood here) from being unfairly "apportioned" downward? In this case, had Roberts known at the time of the state court trial that the district court here was going to apportion Penn National's liability to Attsgood over Gondrezick's exposure period, she could have argued to the jury (based on Roberts' declining blood lead levels) that Gondrezick's exposure time was not a substantial contributing factor to her injury, or indeed, that she did not even *sue* Gondrezick for that very reason.

### D. Penn National's Reliance Upon <u>Utica Mutual</u>, <u>Riley</u> and <u>Hanson</u> Is Misguided; Those Cases Do Not Involve Multiple Defendant/Insureds.

In support of its motion for summary judgment below, Penn National relied upon a line of Maryland cases which adopted and applied the "continuous trigger" rule as the mechanism for determining the amount of available insurance coverage when an injury is continuing in nature and spans more than one policy period. *See Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 802 A.2d 1070 (2002); *United Servs. Auto. Assoc. v. Riley*, 393 Md. 55, 899 A.2d 819 (2005); *Maryland Cas. Co. v. Hanson*, 169 Md. App. 484, 902 A.2d 152 (2006). Specifically, Penn National contended that these cases support its argument that there should be a pro rata allocation of liability among Attsgood, (for the period of no insurance, 1/91-1/92), Penn National (for the insured period 1/92-11/93), and

Gondrezick (for his ownership from 11/93-8/95) based on relative "time on the risk." In fact, none of these cases define the apportioned risk over multiple defendant/insureds, as the district court did here.

In *Utica Mutual, supra,* there were several different insurance carriers who had insured the same asbestos defendant over a number of different policy periods. The defendant had installed asbestos-containing thermal insulation products in various public buildings in Baltimore City. The resulting, continuous asbestos product property damage spanned the respective policy periods of the various carriers. The Court of Special Appeals of Maryland adopted the pro rata time-on-the-risk method of allocation in the context of claims for bodily injury and property damage resulting from long-term and continuous exposure to asbestos. In rejecting the all sums approach adopted in *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981), the Maryland court concluded that the "all sums" language of the general liability policy must be read in concert with other language that limits a policy's liability for damage or loss that occurs during the policy period. 802 A.2d at 1102-03. The court concluded that the pro rata approach is more consistent with the "injury-in-fact/continuous triggers" employed by Maryland courts. *Id.* at 1104. Moreover, under the Maryland approach, losses are prorated to the insured when there is a gap in coverage, unless that gap is due to the insured's "inability to obtain insurance." *Id.*

22

at 1104, n.54. Utica Mutual, however, involved only a single insured, Croker. The court never suggested that the liability of Croker's carriers was to be allocated over any period other than that of Croker's exposure. The other cases are in accord. *See Riley v. United Servs. Auto. Assoc.,* 161 Md. App. 573, 871 A.2d 599 (2005), *aff'd on different grounds*, 899 A.2d 819 (Md. 2006) (endorsing pro rata, time-on-the-risk to lead paint bodily injury claims where damages could not be determined in any particular year, but again, only a single tortfeasor, Hooper, was involved); *In re Wallace & Gale Co.,* 385 F.3d 820 (4th Cir. 2004) (applying pro rata allocation in the asbestos context, but again, only a single tortfeasor, Wallace & Gale, involved); *Maryland Casualty Co. v. Hanson*, 169 Md. App. 484, 902 A.2d 152 (2006) (lead paint claim, but again, only a single tortfeasor, Hanson/CMC, involved).[11]

In the instant case, Penn National's policy for the subject premises went into effect on January 13, 1992 and remained in effect, after renewal, until January 13, 1994.

---

[11]Both *Riley* and *Hanson* were lead paint cases. Both made reference to the Scott Smith article, *Turning Lead into Asbestos and Tobacco: Litigation Alchemy Gone Wrong,* Defense Counsel Journal, Apr. 2004, at 123), and noted: "Prior to 1970, the U.S. Surgeon General defined the 'level of concern' of lead in a young child's blood as 60 mcg/dL, a level rarely seen today. In 1970, the Surgeon General reduced the level of concern to 40 mcg/dL. In 1978, the Centers for Disease Control and Prevention (CDC), having assumed jurisdiction over lead poisoning prevention from the Surgeon General, further reduced the level of concern to 30 mcg/dL; in 1985, to 25 mcg/dL; and in 1991, to 10 mcg/dL, where it stands today." Thus, Roberts' injury was appropriately defined as beginning in 9/92, with her initial elevated BLL, not her date of birth.

The subject premises were then sold to Gondrezick on November 1, 1993. Penn National now attempts to stretch the pro rata allocation of liability concept beyond the contemplation of the holding in *Utica Mutual, supra,* by seeking to allocate liability to the subsequent joint tortfeasor, Gondrezick. The cited various "continuous trigger" cases, from which the concept of pro rata allocation of liability comes, all pertain to multiple insurance policies for the same defendant. There is no support in those cases for Penn National's novel, and erroneous, contention that such allocation should extend across party lines to a separate joint tortfeasor. Indeed, allocating liability to Gondrezick would allow Penn National to do an "end run" around the joint and several liability of its insured, Attsgood, in the underlying case.[12] Under well-established Maryland law, if there is more than one tortfeasor, then their liability is, most often, joint and several. Each tortfeasor is responsible for the entire damage. Each tortfeasor must bear the responsibility for the misconduct of all tortfeasors. *See Carroll v. Kerrigan*, 173 Md. 627, 197 A.127 (1938); *Cooper v. Bikle*, 334 Md. 608

---

[12]The district court criticized Roberts' attempt to distinguish *Utica Mutual* and *Riley* on the basis that the case at bar involves only a single insurer, Penn National: "[c]ontrary to Roberts' contention, Maryland's pro-rata allocation rule applies not only in cases involving multiple insurers but also involving a single insurer who has insured the subject premises for only a portion of the time during which a plaintiff was exposed to hazardous material" (J.A. 385). While it is true that Roberts did additionally argue that distinction below, the court summarily ignored the critical distinction that Roberts argued below, i.e. that the cited Maryland cases, unlike this case, all pertain to multiple policies *for the same insured defendant.* (J.A. 227-29, 376-78).

24

(1994).

### E.  The Policy Language Supports Roberts' Position That Allocation is Not Spread Over the Period of Gondrezick's Ownership.

The language of the CGL policy itself is not usually determinative in cases where the court is debating whether to adopt a joint and several or a pro-rata allocation approach, because of conflicting provisions, *see* footnote 6, *supra*.  However, in this case, the policy language is indeed instructive and argues strongly against Penn National's unique theory of allocation across the period of Gondrezick's ownership, for two reasons: (1) the insuring agreement promises to pay those sums that *the insured* (not all tortfeasors) becomes legally obligated to pay; and (2) the policy provides its own allocation formula.

The policy states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies (J.A. 146).

This language bolsters Roberts' position that the "risk" which Penn National undertook was not the entire underlying injury, but the resulting liability to Attsgood. Allocation is therefore appropriate only across Attsgood's period of exposure, not Gondrezick's.

Moreover, the policy provided its own allocation mechanism:

> This insurance is primary except when b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
>
> . . .
>
> c.  Method of Sharing
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under the approach each insurer contributes equal amounts until it has been paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers (J.A. 152-53).

This language clearly allocates the "loss" (the $850,000 judgment against Attsgood) equally among multiple carriers, if they all agree, or alternatively pro rata, not on the basis of duration of exposure, but on the basis of respective *policy limits*. Therefore, Penn National cannot assert in good faith that it is entitled to pro-rata allocation based on "time-on-the-risk," when its own policy terms dictate allocation on the basis of relative policy limits.  Since Attsgood had no other insurers, Penn National is liable for the entire loss.

26

**II.    THE DISTRICT COURT ERRONEOUSLY APPLIED AN APPORTIONMENT FORMULA TO CREDIT PENN NATIONAL WITH 12 MONTHS' TIME [1/91-1/92] THAT ATTSGOOD WAS UNINSURED, EVEN THOUGH PENN NATIONAL OFFERED NO EVIDENCE BELOW THAT INSURANCE WAS AVAILABLE, THEREBY REDUCING PENN NATIONAL'S INDEMNITY LIABILITY FOR ROBERTS' JUDGMENT AGAINST ATTSGOOD FROM $850,000 TO $370,600.**

In order to maximize insurance recovery for the policyholder, some courts limit the allocation period to the time of "available" coverage.[13]  This rule often leads to the question of whether insurance was in fact available for the covered risk at issue or whether the policyholder consciously elected to "go bare."  It also raises the question of who has the burden of proving availability or unavailability.[14]

It is true that the *Utica Mutual* court held that, in cases where there was a gap in insurance coverage, covered losses in Maryland would be prorated to the insured for those uninsured periods.  *Id.*, 145 Md. App. at 313-314, 802 A.2d at 1104.  The stated rationale for this approach was that there was a need to hold liable those businesses that chose not to purchase insurance coverage or that chose to self-insure. *Id*.  However, the *Utica Mutual*  court also specifically held that such allocation would

---

[13]*See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1203 (2d. Cir. 1995).

[14]*See, e.g., St. Paul Mercury Ins. Co. v. Northern Power Co.,* No. A07–1775, 2009 WL 2596074 (Minn. Ct. App. Aug. 25, 2009).

not be appropriate in cases where coverage was not available. *Id.*, 802 A.2d at 1104, n.54. The court thus expressly followed the *Stonewall* rationale which refuses to include uninsured periods if the insurance was unavailable:

> We agree that such proration is appropriate as to years in which NGC elected not to purchase insurance or purchased insufficient insurance, as demonstrated by the exhaustion of its policy limits. However, we do not agree with the District Judge's subsidiary ruling that proration-to-the-insured should be applied to years after 1985 when asbestos liability insurance was no longer available. Judge Martin applied proration-to-the insured even after 1985. His rationale was that NGC had "bargained away coverage by accepting asbestos exclusion clauses." We think that is not a realistic view of the situation. There is no reason to believe that any bargaining occurred with respect to the asbestos exclusion clauses.

*Stonewall, supra*, 73 F.3d at 1203. From the record in the underlying case, there is simply no way to ascertain why or whether Attsgood and Sachs did not have insurance for the subject premises from Lakia Roberts' birth on 1/17/91 until the Penn National policy went into effect on 1/13/92. It may have been because they could not find a carrier that would issue a policy without an exclusion for lead-based paint injuries. Alternatively, they may have had a policy, but with a carrier that went into bankruptcy or receivership. There is certainly no evidence in the record that suggests that Attsgood and Sachs made a decision not to insure, or to self-insure. Of course, all of this is mere speculation. Penn National cannot meet its burden, as the moving party, to show that Attsgood and Sachs did not have insurance, or that coverage was

28

available to them during the relevant time.  The record is bereft of any evidence at all on this issue.[15]  Thus, the district court erred when it allocated Penn National's liability across any period of uninsurance.

**A.  *The Burden Properly Fell Upon the Moving Party, Penn National, and the Insured, Attsgood, to Establish the Availability of Insurance.***

In *St. Paul Mercury Ins. Co. v. Northern States Power Co.*, 2009 WL 2596074 (Minn. App.), St. Paul insured Northern against certain gas plant contamination lawsuits in Wisconsin.  St. Paul brought a declaratory action against its insured, Northern, to determine the coverage.  Northern argued that the district court erred as a matter of law in determining the start date for the allocation because, in the early years of Northern's operations, liability insurance was unavailable.  On the burden of proof issue, the court ruled:

---

[15] In fact, the unavailability of lead paint insurance was a legislative issue in the early 1990's.  Congress enacted the Residential Lead-Based Paint Hazard Reduction Act of 1992 (the year after Roberts' birth) which included, in part, the creation of a task force to make recommendations to HUD and the EPA concerning "increasing the availability of liability insurance for owners of rental housing."  In 1994, after Penn National was off the coverage here, the Maryland General Assembly established the Lead Poisoning Prevention Program for the purpose of reducing the incidence of childhood lead poisoning and making insurance available, while maintaining the stock of affordable rental housing.  This program required owners of older residential rental properties to meet certain risk reduction standards.  It provided more affordable insurance and the protection of limited liability for owners who comply.  It is administered by the Maryland Department of the Environment (MDE).  (Maryland Code, Environment, Sec., 6-801-6-852; Article 48A, Secs. 734-737; Real Property, Sec. 8-208.2).

> For those periods in which the insured chose to be uninsured (or
> voluntarily self-insured), the insured is liable for its pro rata share of loss,
> and "the total period over which liability is allocated *must include* any
> times during which damages occurred but [the insured] was voluntarily
> self-insured." *Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d
> [283] at 297-98 [Minn. 2006] (emphasis added). But for periods during
> which insurance was not available for the insured, that insured will not be
> assessed a pro rata share of the damages. *Id.* at 297. *The insured has
> the burden* of establishing that no insurance coverage for the particular
> risk at issue was available. *Id.* at 298.

2009 WL 2596074, at 7. Therefore, whether it is because Penn National was the

plaintiff and the moving party below, or whether it is because Attsgood was the

insured here and had the burden under the above case law, the burden of proof here

fell either upon Penn National or Attsgood, not Roberts, to show the availability of

insurance during the period of uninsurance from 1/91-1/92 here. The district court

erred when it required Roberts to prove the contrary, that is, that insurance was

unavailable during the 1/91-1/92 period (J.A. at 384, note 1). Under Maryland law, the

moving party on any proposition has both the burden of production and the burden

of persuasion; it is the moving party who attempts to persuade a court somehow to

alter the status quo. *Herbert v. State*, 136 Md. App. 458, 766 A.2d 190 (2001). In

this case, as the party moving for the allocation or set-off, Penn National carries the

burden of proof on the availability of insurance during the period of no insurance.

Penn National could have alleged that insurance was available in the complaint below, to which Attsgood defaulted, and thus generated the issue for decision. Penn National did not so allege. Certainly Attsgood, as the party procuring the insurance, and Penn National, as the party ultimately providing it in 1992-94, are factually in a better position to prove availability of insurance than Roberts. Further, Penn National is the party seeking allocation across the uninsured period here, not Roberts. It had the burden of proving all facts supporting its allocation formula, including the fact, if true, that insurance was available to Attsgood in 1991-92. Roberts had no such burden.[16]

## B. The Policy Contains Its Own Allocation Formula That is Based on Policy Limits, Not Time-On-The-Risk.

As shown above, Penn National's own policy language refutes "time-on-the-risk" allocation (J.A. 152-53). If there are multiple carriers and all agree, liability is apportioned equally. If they do not all agree, liability is apportioned on the basis of relative policy limits. Clearly, Penn National is not entitled to time-on-the-risk allocation, including any period of self-insurance.

---

[16]In fact, Penn National *opposed* Roberts' efforts below to "step into the shoes" of Attsgood (J.A. 59-60), and argued that any assignment of Attsgood's rights to Roberts would be "immaterial" to Attsgood's default (J.A. 66). Thus, Penn National denied Roberts any opportunity to make a showing of unavailability on Attsgood's behalf.

31

III.   **ASSUMING ARGUENDO THAT PRORATION FOR THE PERIOD OF NO INSURANCE IS APPROPRIATE HERE, THE DISTRICT COURT ERRONEOUSLY USED ROBERTS' DATE OF BIRTH, RATHER THAN HER FIRST ACTUAL LEAD EXPOSURE, TO CREDIT PENN NATIONAL WITH 20 MONTHS' TIME THAT UNJUSTLY REDUCED PENN NATIONAL'S INDEMNITY LIABILITY TO ATTSGOOD FROM $850,000 TO $370,600.**

Even if there was evidence that insurance was available and that Attsgood and Sachs had chosen to self-insure during the period 1/91-1/92, there was no evidence below that Roberts was exposed to lead at the subject premises prior to Penn National's policy period. Indeed, Roberts' medical expert in the underlying case unequivocally testified that Roberts' blood lead levels indicated that she was injuriously exposed to lead from the age of 20 months to the age of four years (J.A. 279).[17]

Roberts was born on 1/17/91 and was 20 months old on 1/17/92. Penn National's initial policy went into effect on 1/13/92. Thus, based on the undisputed evidence in the record before this Court, Roberts' injurious lead exposure began

_____

[17]Arguments II and III herein overlap in the sense that Roberts only needs to prevail on one of them to preclude Penn National from allocating any liability across the uninsured 1/91-1/92 period. As Penn National conceded below, the Argument III issue becomes moot if Roberts prevails on Argument II above, i.e. that Penn National cannot, as matter of law, allocate liability across any period when Attsgood was uninsured in the absence of any evidence that insurance was available during that period. Conversely, Argument II becomes moot if this Court rules in Roberts' favor in this Argument III that there was no evidence of injurious lead exposure before September 1992 (J.A. 340 note 7).

approximately eight months into the Penn National policy period. Accordingly, there is no factual basis for allocating any liability to Attsgood and Sachs for the uninsured period of 1/17/91-1/13/92.

At the trial of the underlying case, Roberts' medical expert, Jacalyn Blackwell-White, M.D., testified that she was initially diagnosed with an elevated lead level of 28 mcg/dL at 20 months of age (J.A. 264, 266). She further stated that, after her initial diagnosis in 1/92, Roberts experienced an "increase in lead levels to about 31 months, just under the age of three, and then a gradual decrease" (J.A. 278). Dr. Blackwell-White's testimony about the dates of Ms. Roberts' lead exposure at the subject premises are explained and supported by her testimony regarding the way children get lead into their systems. At trial, she testified that children are determined to have been injuriously exposed to lead by looking at serum lead levels (J.A. 255). Lead gets into the child though ingestion via the mouth, which then goes into the GI tract, where it is quickly absorbed into the child's body (J.A. 256). According to Dr. Blackwell-White, children access the leaded paint by, "pull[ing] up and gnaw[ing] on whatever is around them, and crawl[ing] on the floor and put[ing] their hands in their mouths" (J.A. 313-14). Clearly, newborn babies cannot crawl around, or pull themselves up to gnaw on anything. Those abilities come much later in their development. There is simply no evidence to support Penn National's contention that Roberts, as a newborn baby and

33

infant, was able to access her environment in the way that Dr. Blackwell-White explained was necessary in order to ingest leaded paint.[18]  Moreover, Roberts was 31 months old in 11/93, the precise time that Attsgood sold the subject premises to Gondrezick.  Thereafter, her BLLs began a gradual decrease.  According to Dr. Blackwell-White, Roberts' lead exposure ended at the age of four years, which was in 1/95.  Moreover, by that time, according to Dr. Blackwell-White's testimony, her blood lead levels had been on the decline for 17 months.

In its memoranda below, Penn National cited to the opening and closing statements of counsel from the trial of the underlying case as "evidence" in support of its contention that  Roberts' exposure to lead at the subject premises began on the day she first drew breath, as opposed to the date she was initially diagnosed with lead poisoning.  Under Maryland law, however, it is axiomatic that "[w]hat lawyers say in their opening statements and what they say in their closing arguments and what they

_____

[18]Dr. Blackwell-White's testimony is remarkably consistent with the opinions of the late J. Julian Chisholm, M.D., a renowned expert in childhood lead poisoning, in the case of *Scottsdale Ins. Co. v. American Empire*, 811 F.Supp. 210 (Md. 1993) ("A child is most likely to ingest lead paint between her first and third birthdays since that is the period during which her sucking reflex is strongest and her mobility to get out of the crib (and to get to places where lead is located) has become developed").  The CDC itself states that children "between 12-36 months of age have a lot of hand-to-mouth activity, so if there is lead in their homes, they are more likely to take it in than are older children. *See* "What Every Parent Should Know About Lead Poisoning in Children," www.cdc.gov/nceh/lead/faq/cdc97a.htm.

say in making objections or in making motions are not evidence.  The evidence consists only of the testimony of the witnesses, any exhibits...and any facts which may be stipulated to or agreed upon by both sides." *Thimatariga v. Chambers*, 46 Md. App. 260, 266, 416 A.2d 1326, 1330 (1980); MPJI-Cv 1:1 (4th Ed.).  Accordingly, Penn National's contention that remarks made during counsel's opening statement and closing argument are somehow substantive evidence or admissions by  Roberts is incorrect as a matter of Maryland law.

Moreover, even if those statements were considered evidence, or admissions, as Penn National claimed, Roberts' counsel never contended in opening statement that she had been exposed to lead from her birth in 1991 until 1998, as Penn National now argues.  Roberts' counsel stated to the jury:

> "In fact, some of those studies, the CDC studies, showed that the biggest hit to the childrens' brain (sic) from the lead that came from the first ten.  It's not that the higher levels didn't add more damage, but that the hardest hit to a child happens within the first ten."  (J.A. 354).

At most, these remarks indicate counsel's knowledge of CDC studies that the "hardest hit" occurred at some unspecified point before 9/92, the date that Roberts was first diagnosed with an elevated blood lead level of 28 mcg/dL (J.A. 269).  Penn National's insurance policy for Attsgood took effect 8 months earlier, on 1/13/92.  There is simply no evidence as to how long before the elevated BLL in 9/92 there

might have been detectable lead levels in Roberts' serum.  If it is Penn National's contention that that date is prior to 1/92 when it went on the coverage, the burden was Penn National's to so prove.

Likewise, the closing arguments from the underlying case cited by Penn National offer no support for its contention that Roberts incurred injurious lead exposure from 1/91-1/92.  Penn National quoted counsel's closing argument to argue that the subject property had deteriorated paint flakes and chips present from before the time Ms. Roberts was born until the time she and her mother moved out of the house (J.A. 345, 364).  Those comments, however, said nothing about actual exposure.  What Penn National fails to grasp is that the cited statement related to Attsgood's  liability, not Roberts' period of exposure and resulting injuries.   Roberts' counsel made the following closing statement:

> "And the duty in this case is based upon the Baltimore City Housing Code which is Section 703 (sic), requires that all walls, ceilings, wordwork, doors and windows shall be kept clean and free of any chipping and loose, flaking paint.
>
> That's the duty from the defendants in this case for Lakia Roberts and her family...and although renting the property that contains lead based paint is not illegal in Baltimore, obviously if any paint is chipping, it is illegal, and that applies to the owners of the property and also to any management companies or partners that they have.
>
> Now, there's no real controversy in this case that this duty to keep it free of chipping paint was breached.  You've heard testimony from [the

36

mother] that there was chipping and flaking paint at this property from before Lakia was born, all the way until the day the family moved out of the property. And no one ever painted it, not that entire time. In fact, she said the entire time she grew up there, and she grew up there in the '70's, no one ever painted that house." (J.A. 382).

Thus, counsel's references to deteriorated paint at the subject property from before Roberts' birth until 1998 were made in relation to the breach of duty by Attsgood, not to Roberts' period of lead exposure. Children do not absorb lead into their systems by osmosis, as Penn National apparently believes. Children are not exposed to lead simply by virtue of being near a lead hazard. They must ingest the lead to have exposure and resulting injury. That hand-to-mouth activity, as described in footnote 18, *supra*, most often occurs between 12-36 months of age.

In addition to the opening and closing arguments, Penn National and the district court both erroneously cited Dr. Blackwell-White's testimony about the CDC studies which show that the worst damage from lead poisoning comes from the exposure that results in the first $\geq 10$ mcg/dL BLL (J.A. 344-45). In fact, that testimony supports Roberts' contention that most, if not all, of her injuries were incurred during Penn National's policy periods. Dr. Blackwell-White unequivocally opined that Ms. Roberts' was exposed to lead beginning with her initial 28 mcg/dL diagnosis at the age of 20 months (J.A. 279). Accordingly, under the CDC studies cited by Dr. Blackwell-White, and now Penn National, the biggest "hit" to Roberts' brain came as a result of

the exposure that culminated in the first elevated BLL registered in 9/92, eight months into Penn National's policy period. However, there is no evidence whatsoever to support Penn National's claim that Roberts ever had *any* elevated blood lead level before its policy went into effect in 1/92. Penn National simply cannot escape the uncontroverted evidence in this case that Roberts:

> "was exposed, conservatively, exposed to lead from the age of 20 months on through to four years. And in fact, beyond that. But the levels themselves, based on the CDC points of ten and above, would take her down to four years." (J.A. 279).

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the judgment of the district court should be REVERSED and the case should be remanded with instructions to enter judgment in favor of Lakia Roberts and against Penn National in the full amount of the underlying judgment, to wit, $850,000, plus accrued post-judgment interest at 10% per annum since the date of the underlying judgment, 7/31/09.

## REQUEST FOR ORAL ARGUMENT

Roberts respectfully requests that oral argument be heard.

Respectfully submitted,

  /s/ John Amato, IV
John Amato, IV
GOODMAN, MEAGHER & ENOCH, LLP
111 N. Charles Street
Baltimore, Maryland  21201
(410) 752-3666


  /s/ Bruce H. Powell
Bruce H. Powell
LAW OFFICES OF PETER T. NICHOLL
36 South Charles Street,
Suite 1700
Baltimore, Maryland  21201
(410) 244-7005


Attorneys for Defendant Lakia C. Roberts


## STATEMENT OF FONT SIZE AND LOCAL RULE 32(a)(7) CERTIFICATION

This brief was prepared in 14-point Times New Roman font, and has a word count of 9722 words using Microsoft Word.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of October, 2010, I caused this Brief of Appellant to be filed with the Clerk of the Court via hand delivery and electronically using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users and further certify that a copy of the Brief of Appellant and Joint Appendix was served via U.S. Mail, First Class, postage paid to:

Kevin Thomas Streit
Regina Maria Policano
Midkiff, Muncie & Ross, PC
300 Arboretum Parkway, Suite 420
Richmond, Virginia 23236
kstreit@midkifflaw.com
gpolicano@midkifflaw.com

*Counsel for Plaintiff-Appellee/Cross-Appellant*
*Pennsylvania National Mutual Casualty Insurance Company*

*/s/ May Serafim*
Lantagne Legal Printing
801 East Main Street, Suite 100
Richmond, Virginia 23219
(804) 644-0477